**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| *In re Emmanuel College Data Security Incident* | Case No. 1:24-cv-10314-AK |
| | **JURY TRIAL DEMANDED** |

**CONSOLIDATED CLASS ACTION COMPLAINT**

1.      Plaintiffs Elizabeth Parchinskya, Grace Viviano, Brian Hamdan, Sopiya Shrestha, Casey Whalen, and Luke Millspaugh (collectively, "Plaintiffs"), individually, and on behalf of all others similarly situated, bring this action against the Trustees of Emmanuel College ("Emmanuel" or "Defendant"). Plaintiffs bring this action by and through their attorneys, and allege, based upon personal knowledge as to their own actions, and based upon information and belief and reasonable investigation by their counsel as to all other matters, as follows.

## I.      INTRODUCTION

1.      Plaintiffs bring this action against Emmanuel for its failure to properly secure and safeguard the sensitive personally identifiable information   ("PII") and protected health information ("PHI") (collectively with PII, "Private Information") that it collected and maintained concerning its current and former students, employees, and applicants, as part of Defendant's regular business practices. As part of its operations, Emmanuel collects, maintains, and stores highly sensitive personal and medical information concerning its current, former, and prospective students and employees, including, but not limited to full names, academic transcripts, class schedules, dates of birth, student ID numbers, financial aid awards, financial aid payments, GPA, grade on assignments and tests; health insurance information and other medical records.

2.     Emmanuel College is a private Roman Catholic university in Boston, Massachusetts.

3.     On April 27, 2023, cybercriminals accessed Emmanuel's information systems and databases and stole Private Information belonging to Emmanuel's current, former, and prospective students and employees (the "Data Breach"). On an undisclosed date, Defendant discovered the Data Breach and began an investigation, and, on January 16, 2024, determined that "the files removed from [its] network by the unauthorized actors on April 27, 2024 contain[ed]" Plaintiffs' and Class Members' Private Information.

4.     Emmanuel's investigation concluded that the Private Information of approximately 89,000 individuals had been exfiltrated in the Data Breach.

5.     On January 31, 2024, Emmanuel sent notices to individuals whose Private Information was accessed in the Data Breach.

6.     Because Emmanuel stored and handled Plaintiffs' and Class Members' highly sensitive Private Information, it had a duty and obligation to safeguard this information and prevent unauthorized third parties from accessing this data.

7.     Ultimately, Emmanuel failed to fulfill this obligation, as unauthorized cybercriminals breached its information systems and databases and stole vast quantities of Private Information belonging to current, former, and prospective students and employees, including Plaintiffs and Class Members. The Data Breach—and the successful exfiltration of Private Information—were the direct, proximate, and foreseeable results of multiple failings by Emmanuel.

8.     The Data Breach occurred because Emmanuel failed to implement reasonable security protections to safeguard its information systems and databases. Moreover, prior to Data

Breach, Emmanuel failed to inform the public that its data security practices were deficient and inadequate. Had Plaintiffs and Class Members been made aware of this fact, they would have never provided such information to Emmanuel.

9.      Emmanuel's meager attempt to ameliorate the effects of this data breach with complimentary credit monitoring is woefully inadequate. Much of the Private Information that was stolen is immutable and just one year of credit monitoring is nothing in the face of a life-long heightened risk of identity theft.

10.     As a result of Emmanuel's negligent, reckless, intentional, and/or unconscionable failure to adequately satisfy its contractual, statutory, and common-law obligations, Plaintiffs and Class Members suffered injuries, but not limited to:

- Lost or diminished value of their Private Information;

- Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information;

- Lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges;

- Time needed to investigate, correct and resolve unauthorized access to their accounts; time needed to deal with spam messages and e-mails received subsequent to the Data Breach;

- Charges and fees associated with fraudulent charges on their accounts; and

- The continued and increased risk of compromise to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

11.     Accordingly, Plaintiffs bring this action on behalf of all those similarly situated to seek relief for Defendant's failure to reasonably safeguard Plaintiffs' and Class Members' Private

Information and for Defendant's failure to inform Plaintiffs and Class Members concerning the status, safety, location, access, and protection of their Private Information.

## II.      PARTIES

### Plaintiff Elizabeth Parchinskya

12.      Plaintiff Elizabeth Parchinskya is a resident and citizen of Boston, Massachusetts. Plaintiff Parchinskya is a victim of the Data Breach and received Defendant's Data Breach Notice.

### Plaintiff Grace Viviano

13.      Plaintiff Grace Viviano is a resident and citizen of Boston, Massachusetts. Plaintiff Viviano is a former student and employee of Emmanuel College. Plaintiff Viviano received Defendant's Data Breach Notice.

### Plaintiff Brian Hamdan

14.      Plaintiff Brian Hamdan is a resident and citizen of Boston, Massachusetts. Plaintiff Hamdan is a current student at Emmanuel College. Plaintiff Hamdan received Defendant's Data Breach Notice.

### Plaintiff Sopiya Shrestha

15.      Plaintiff Sopiya Shrestha is a resident and citizen of Somerville, Massachusetts. Plaintiff Shrestha received Defendant's Data Breach Notice.

### Plaintiff Casey Whalen

16.      Plaintiff Casey Whalen is a resident and citizen of Rockingham County, New Hampshire. Plaintiff Whalen applied to Emmanuel College but elected to not attend Emmanuel. Plaintiff Whalen received Defendant's Data Breach Notice.

**Plaintiff Luke Millspaugh**

17.     Plaintiff Luke Millspaugh is a resident and citizen of Suffolk County, Massachusetts. Plaintiff Millspaugh applied to Emmanuel College but elected to not attend Emmanuel. Plaintiff Millspaugh received Defendant's Data Breach Notice.

**Defendant Emmanuel College**

18.     Emmanuel College is a Massachusetts corporation with its principal place of business located on school grounds at 400 The Fenway, Boston, MA 02115.

### III.     JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, the number of class members exceeds 100, and at least one Class member, including Plaintiff Whalen, is a citizen of a state different from Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

20.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in this state.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District.

### IV.     FACTUAL ALLEGATIONS

#### A.     Emmanuel College – Background

22.     Emmanuel College is a private Catholic college in Boston, Massachusetts. Approximately 2,500 students currently attend the college each year. Emmanuel employs approximately 77 academic staff and 92 non-academic staff. As part of its normal operations,

Emmanuel collects, maintains, and stores large volumes of Private Information belonging to its current, former, and prospective students and employees.

23.      In order to apply to admission at Emmanuel, enroll in class, or obtain employment from Emmanuel, individuals are required to provide Emmanuel with their sensitive Private Information.

24.      Upon information and belief, Defendant made promises and representations to students, applicants, and employees, including Plaintiffs and Class Members, that their Private Information would be kept safe, confidential, maintained as private, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

25.      Indeed, Defendant's Privacy Policy provides that: "Emmanuel College is committed to the privacy of all visitors—including alumni, students, faculty, staff and friends."[1]

26.      Current, former, and prospective students and employees at Emmanuel, such as Plaintiffs and Class Members, made their Private Information available to Emmanuel with the reasonable expectation that any entity with access to this information would keep that sensitive and personal information confidential and secure from illegal and unauthorized access. They similarly expected that, in the event of any unauthorized access, the entity would provide them with prompt and accurate notice.

27.      Emmanuel failed to implement necessary data security safeguards at the time of the Data Breach. This failure resulted in cybercriminals accessing the Private Information of Emmanuel's current, former, and prospective students and employees—Plaintiffs and Class Members.

---

[1] https://www.emmanuel.edu/copyright-and-privacy-policy#:~:text=The%20College%20will%20use%20your,processing%20and%20and%20completing%20academic%2C%20financial.

28.     This expectation was objectively reasonable and based on an obligation imposed on Emmanuel by statute, regulations, industrial custom, and standards of general due care.

29.     Unfortunately for Plaintiffs and Class Members, Emmanuel failed to carry out its duty to safeguard sensitive Private Information and provide adequate data security. As a result, it failed to protect Plaintiffs and Class Members from having their Private Information accessed and stolen during the Data Breach.

**B.      The Data Breach**

30.     According to Defendants' public statements, cybercriminals breached Emmanuel's information systems on or about April 27, 2023. Defendant's subsequent investigation determined on January 16, 2024, that files removed from Defendant's network in the Data Breach contained current, former, and prospective students' and employees' Private Information.

31.     On January 31, 2024, Emmanuel began sending notice of the Data Breach to all individuals affected by this data security incident.

32.     Omitted from Defendant's Data Breach notice were the date that Defendant discovered the Data Breach, an explanation of why Defendant failed to notify Plaintiffs and Class Members of the Data Breach for more than nine months after the Data Breach occurred, the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures taken to ensure that such a breach does not occur again.

33.     The Data Breach notice letter fails to inform Plaintiffs and Class Members with any degree of specificity of the critical facts of the Data Breach. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

34.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it maintained concerning Plaintiffs and Class Members, causing the exposure of the Private Information, such as encrypting the information or deleting it when it was no longer needed.

35.     The cybercriminals accessed and exfiltrated files in Defendant's systems containing the unencrypted Private Information concerning Plaintiffs and Class Members in the Data Breach.

36.     Plaintiffs further believe that their Private Information, as well as the information concerning Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

C.      **Emmanuel's Many Failures Both Prior to and Following the Breach**

37.     Defendant collects and maintains vast quantities of Private Information belonging to Plaintiffs and Class Members as part of its normal operations. The Data Breach occurred as direct, proximate, and foreseeable results of multiple failings on the part of Defendant.

38.     First, Defendant inexcusably failed to implement reasonable security protections to safeguard its information systems and databases.

39.     Second, Defendant failed to timely detect this data breach with Defendant's computer systems.

40.     Third, Defendant failed to inform the public that its data security practices were deficient and inadequate. Had Plaintiffs and Class Members been aware that Defendant did not have adequate safeguards in place to protect such sensitive Private Information, they would have never provided such information to Defendant.

41.     In addition to the failures that lead to the successful breach, Defendant's failings in handling the breach and responding to the incident exacerbated the resulting harm to the Plaintiffs and Class Members.

42.     Defendant's attempt to ameliorate the effects of this data breach with limited complimentary credit monitoring is woefully inadequate. Plaintiffs' and Class Members' Private Information was accessed and acquired by cybercriminals for the express purpose of misusing the data. As a consequence, they face the real, immediate, and likely danger of identity theft and misuse of their Private Information. This can, and in some circumstances already has, caused irreparable harm to their personal, financial, reputational, and future well-being. This harm is even more acute because much of the stolen Private Information, such as healthcare data, is immutable.

43.     In short, Defendant's myriad failures, including the failure to timely detect an intrusion, allowed unauthorized individuals to access, misappropriate, and misuse Plaintiffs' and Class Members' Private Information for over 10 months before Defendant finally granted victims the opportunity to take proactive steps to defend themselves and mitigate the near- and long-term consequences of the Data Breach.

**D.     <u>Data Breaches Pose Significant Threats</u>**

44.     Data breaches have become a constant threat that, without adequate safeguards, can expose personal data to malicious actors. It is well known that PII, and Social Security numbers in particular, is an invaluable commodity and a frequent target of hackers.

45.     In the third quarter of the 2023 fiscal year alone, 7,333 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[2]

_____

[2] *See* https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/

46.     In 2022, the Identity Theft Resource Center's Annual End-of-Year Data Breach Report listed 1,802 total compromises involving 422,143,312 victims for 2022, which was just 50 compromises short of the current record set in 2021.[3]

47.     Statista, a German entity that collects and markets data relating to, among other things, data breach incidents and the consequences thereof, confirms that the number of data breaches has been steadily increasing since it began a survey of data compromises in 2005 with 157 compromises reported that year, to a peak of 1,862 in 2021, to 2022's total of 1,802.[4] The number of impacted individuals has also risen precipitously from approximately 318 million in 2015 to 422 million in 2022, which is an increase of nearly 50%.[5]

48.     This stolen PII is then routinely traded on dark web black markets as a simple commodity, with social security numbers being so ubiquitous to be sold at as little as $2.99 apiece and passports retailing for as little as $15 apiece.[6]

49.     An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[7] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[8,9]

---

[3] *2022 End of Year Data Breach Report*, Identity Theft Resource Center (January 25, 2023), available at: https://www.idtheftcenter.org/publication/2022-data-breach-report/?utm_source=press+release&utm_medium=web&utm_campaign=2022+Data+Breach+Report.
[4] *Annual Number of Data Breaches and Exposed Records in the United States from 2005 to 2022*, Statista, available at: https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed/.
[5] *Id.*
[6] *What is your identity worth on the dark web?* Cybernews (September 28, 2021), available at: https://cybernews.com/security/whats-your-identity-worth-on-dark-web/.
[7] https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[8] https://datacoup.com/
[9] https://digi.me/what-is-digime/

50.     Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[10]

51.     Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[11]

52.     As a result of the Data Breach, Plaintiffs' and Class Members' Private Infomration, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

53.     In addition, the severity of the consequences of a compromised social security number belies the ubiquity of stolen numbers on the dark web. Criminals and other unsavory groups can fraudulently take out loans under the victims' name, open new lines of credit, and cause other serious financial difficulties for victims:

> [a] dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[12]

---

[10]  Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

[11]  *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/

[12] United States Social Security Administration, *Identity Theft and Your Social Security Number*, United States Social Security Administration (July 2021), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

This is exacerbated by the fact that the problems arising from a compromised social security number are exceedingly difficult to resolve. A victim is forbidden from proactively changing his or her number unless and until it is actually misused and harm has already occurred. And even this delayed remedial action is unlikely to undo the damage already done to the victims:

> Keep in mind that a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.[13]

54.     The most sought after and expensive information on the dark web are stolen medical records which command prices from $250 to $1,000 each.[14] Medical records are considered the most valuable because unlike credit cards, which can easily be canceled, and social security numbers, which can be changed, medical records contain "a treasure trove of unalterable data points, such as a student's medical and behavioral health history and demographics, as well as their health insurance and contact information."[15] With this bounty of ill-gotten information, cybercriminals can steal victims' public and insurance benefits and bill medical charges to victims' accounts.[16] Cybercriminals can also change the victims' medical records, which can lead to misdiagnosis or mistreatment when the victims seek medical treatment.[17] Victims of medical

---

[13] *Id.*

[14] Paul Nadrag, Capsule Technologies, *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web*, Fierce Healthcare (January 26, 2021), available at: https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web.

[15] *Id.*

[16] *Medical Identity Theft in the New Age of Virtual Healthcare*, IDX (March 15, 2021), available at https://www.idx.us/knowledge-center/medical-identity-theft-in-the-new-age-of-virtual-healthcare. *See also* Michelle Andrews, *The Rise of Medical Identity Theft*, Consumer Reports (August 25, 2016), available at https://www.consumerreports.org/health/medical-identity-theft-a1699327549/.

[17] *Id.*

identity theft could even face prosecution for drug offenses when cybercriminals use their stolen information to purchase prescriptions for sale in the drug trade.[18]

55.     The wrongful use of compromised medical information is known as medical identity theft and the damage resulting from medical identity theft is routinely far more serious than the harm resulting from the theft of simple PII. A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident, and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[19] It is also "considerably harder" to reverse the damage from the aforementioned consequences of medical identity theft.[20]

56.     Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches[21] with 41 million healthcare records exposed, stolen, or compromised across 505 data breaches in 2019 alone.[22]

57.     Per Pam Dixon, executive director of the World Privacy Forum, "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery . . . Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[23]

---

[18] *Id.*

[19] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed July 24, 2023).

[20] Medical Identity Theft, AARP (March 25, 2022), available at: https://www.aarp.org/money/scams-fraud/info-2019/medical-identity-theft.html.

[21] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/ (last accessed July 24, 2023).

[22] https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last accessed July 24, 2023).

[23] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last accessed July 24, 2023).

58.    In light of recent high profile data breaches at industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

59.    In addition, the Federal Trade Commission ("FTC") has brought dozens of cases against companies that have engaged in unfair or deceptive practices involving inadequate protection of consumers' personal data, including recent cases concerning health-related information against LabMD, Inc., SkyMed International, Inc., and others. The FTC publicized these enforcement actions to place companies like Defendant on notice of their obligation to safeguard customer and student information.[24]

60.    Given the nature of Defendant's Data Breach, as well as the length of the time Defendant's networks were breached and the long delay in notification to victims thereof, it is foreseeable that the compromised Private Information has been or will be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Plaintiffs' and Class Members' Private Information can easily obtain Plaintiffs' and Class Members' tax returns or open fraudulent credit card accounts in their names.

61.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because credit card victims can cancel or close credit and debit card accounts.[25] The

---

[24] *See, e.g.*, *In the Matter of SKYMED INTERNATIONAL, INC.*, C-4732, 1923140 (F.T.C. Jan. 26, 2021).
[25] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, Forbes (Mar 25, 2020), available at https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1. *See also Why Your Social*

information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

62.     To date, Defendant has offered its consumers only limited identity theft monitoring services. The services offered are inadequate to protect Plaintiffs and Class Members from the threats they will face for years to come, particularly in light of the Private Information at issue here.

63.     Despite the prevalence of public announcements of data breach and data security compromises, its own acknowledgment of the risks posed by data breaches, and its own acknowledgment of its duties to keep Private Information private and secure, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from misappropriation. As a result, the injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for its current, former, and prospective students and employees.

**E.     Emmanuel Had a Duty and Obligation to Protect Private Information**

64.     Defendant has an obligation to protect the Private Information belonging to Plaintiffs and Class Members. First, this obligation was mandated by government regulations and state laws, including HIPAA and FTC rules and regulations. Second, this obligation arose from industry standards regarding the handling of sensitive PII and medical records. Plaintiffs and Class Members provided, and Defendant obtained, their information on the understanding that it would be protected and safeguarded from unauthorized access or disclosure.

---

*Security Number Isn't as Valuable as Your Login Credentials*, Identity Theft Resource Center (June 18, 2021), available at https://www.idtheftcenter.org/post/why-your-social-security-number-isnt-as-valuable-as-your-login-credentials/.

65.     In addition, the United States Government has recommended that entities that handle Private Information implement the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[26]

### 1.   <u>HIPAA Requirements and Violation</u>

66.    HIPAA requires, *inter alia*, that Covered Entities and Business Associates implement and maintain policies, procedures, systems and safeguards that ensure the confidentiality and integrity of consumer and student PII and PHI, protect against any reasonably anticipated threats or hazards to the security or integrity of consumer and student PII and PHI, regularly review access to data bases containing protected information, and implement procedures and systems to detect, contain, and correct any unauthorized access to protected information. *See* 45 CFR § 164.302, *et seq.*

67.    HIPAA, as applied through federal regulations, also requires private information to be stored in a manner that renders it, "unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology. . . ." 45 CFR § 164.402.

68.    Defendant failed to implement and/or maintain procedures, systems, and safeguards to protect the Private Information belonging to Plaintiffs and Class Members from unauthorized access and disclosure.

69.    Upon information and belief, Defendant's security failures include, but are not limited to:

a.    Failing to maintain an adequate data security system to prevent data loss;

---

[26] How to Protect Your Networks from RANSOMWARE, at 3–4, available at:
https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

b.       Failing to mitigate the risks of a data breach and loss of data;

c.       Failing to ensure the confidentiality and integrity of electronic protected health information Defendant creates, receives, maintains, and transmits in violation of 45 CFR 164.306(a)(1);

d.       Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

e.       Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f.       Failing to identify and respond to suspected or known security incidents;

g.       Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

h.       Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

i.       Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

j.       Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce, in violation of 45 CFR 164.306(a)(94); and

k.       Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

70.    Upon information and belief, Defendant also failed to store the information it collected in a manner that rendered it, "unusable, unreadable, or indecipherable to unauthorized persons," in violation of 45 CFR § 164.402.

2.      <u>**FTC Act Requirements and Violations**</u>

71.      The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

72.      In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[27] The guidelines note businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.[28] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[29] Defendant clearly failed to do any of the foregoing, as evidenced by the length of the Data Breach, the fact that the Breach went undetected, and the amount of data exfiltrated.

---

[27] *Protecting Personal Information: A Guide for Business*, Federal Trade Comm'n (October 2016), available at https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last accessed August 15, 2023).
[28] *Id.*
[29] *Id.*

73.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

74.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

75.     Additionally, the FTC Health Breach Notification Rule obligates companies that suffered a data breach to provide notice to every individual affected by the data breach, as well as notifying the media and the FTC. *See* 16 CFR 318.1, *et seq.*

76.     As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

77.     Defendant was fully aware of its obligation to protect the Private Information of its current, former, and prospective students and employees, including Plaintiffs and Class Members. Defendant is a sophisticated business that relies extensively on technology systems and networks to maintain its operations.

78.     Defendant had and continues to have a duty to exercise reasonable care in collecting, storing, and protecting the Private Information from the foreseeable risk of a data

breach. The duty arises out of the special relationship that exists between Defendant and Plaintiffs and Class Members. Defendant alone had the exclusive ability to implement adequate security measures to its cyber security network to secure and protect Plaintiffs' and Class Members' Private Information.

### 3. **Industry Standards and Noncompliance**

79.     As noted above, experts studying cybersecurity routinely identify higher education institutions as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

80.     Some industry best practices that should be implemented by higher education institutions dealing with sensitive Private Information, like Defendant, include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

81.     Other best cybersecurity practices that are standard in the higher education industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

82.     Defendant should have also followed the minimum standards of any one of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1,

PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

83.    Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

### 4.    Plaintiffs and the Class Suffered Harm Resulting from the Data Breach

84.    Like any data hack, the Data Breach presents major problems for all affected.[30]

85.    The FTC warns the public to pay particular attention to how they keep personally identifying information including Social Security numbers and other sensitive data. As the FTC notes, "once identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[31]

86.    The ramifications of Defendant's failure to properly secure Plaintiffs' and Class Members' Private Information are severe. Identity theft occurs when someone uses another person's financial, and personal information, such as that person's name, address, Social Security number, and other information, without permission in order to commit fraud or other crimes.

87.    According to data security experts, one out of every four data breach notification recipients become a victim of identity fraud.

88.    Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

---

[30] Paige Schaffer, *Data Breaches' Impact on Consumers*, Insurance Thought Leadership (July 29, 2021), available at https://www.insurancethoughtleadership.com/cyber/data-breaches-impact-consumers.
[31] *Warning Signs of Identity Theft*, Federal Trade Comm'n, available at https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft.

89.     Accordingly, Defendant's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiffs and the Class at an imminent, immediate, and continuing increased risk of identity theft and identity fraud. According to a recent study published in the scholarly journal *Preventive Medicine Reports*, public and corporate data breaches correlate to an increased risk of identity theft for victimized consumers.[32] The same study also found that identity theft is a deeply traumatic event for the victims, with more than a quarter of victims still experiencing sleep problems, anxiety, and irritation even six months after the crime.[33]

90.     There is also a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that has not yet been exploited by cybercriminals presents a concrete risk that the cybercriminals who now possess Class Members' Private Information will do so at a later date or re-sell it.

91.     Data breaches have also proven to be costly for affected organizations as well, with the average cost to resolve being $4.45 million dollars in 2023.[34] The average cost to resolve a data breach involving health information, however, is more than double this figure at $10.92 million.[35]

92.     The theft of medical information, beyond the theft of more traditional forms off PII, is especially harmful for victims. Medical identity theft, the misuse of stolen medical records and information, has seen a seven-fold increase over the last five years and this explosive growth far

---

[32] David Burnes, Marguerite DeLiema, Lynn Langton, *Risk and protective factors of identity theft victimization in the United States*, Preventive Medicine Reports, Volume 17 (January 23, 2020), available at https://www.sciencedirect.com/science/article/pii/S2211335520300188?via%3Dihub.
[33] *Id.*
[34] *Cost of a Data Breach Report 2023*, IBM Security, available at https://www.ibm.com/reports/data-breach?utm_content=SRCWW&p1=Search&p4=43700072379268622&p5=p&gclid=CjwKCAjwxOymBhAFEiwAnodBLGiGtWfjX0vRlNbx6p9BpWaOo9eZY1i6AMAc6t9S8IKsxdnbBVeUbxoCtk8QAvD_BwE&gclsrc=aw.ds.
[35] *Id.*

outstrips the increase in incidence of traditional identity theft.[36] Medical Identity Theft is especially nasty for victims because of the lack of laws that limit a victim's liabilities and damages from this type of identity theft (e.g., a victim's liability for fraudulent credit card charges is capped at $50), the unalterable nature of medical information, the sheer costs involved in resolving the fallout from a medical identity theft (victims spend, on average, $13,500 to resolve problems arising from this crime), and the risk of criminal prosecution under anti-drug laws.[37]

93.    In response to the Data Breach, Defendant offered to provide certain individuals whose Private Information was exposed in the Data Breach with a mere year of credit monitoring. However, this is inadequate to protect victims of the Data Breach from the lifelong risk of harm imposed on them by Defendant's failures.

94.    Moreover, the credit monitoring offered by Defendant is fundamentally inadequate to protect them from the injuries resulting from the unauthorized access and exfiltration of their sensitive Private Information.

95.    Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to enroll with Defendant under certain terms, Plaintiffs and other reasonable Class Members understood and expected that Defendant would properly safeguard and protect their Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

---

[36] Medical Identity Theft, AARP (March 25, 2022), available at: https://www.aarp.org/money/scams-fraud/info-2019/medical-identity-theft.html.
[37] Id.

96.     Here, due to the Breach, Plaintiffs and Class Members have been exposed to injuries that include, but are not limited to:

a.     Theft of Private Information;

b.     Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts as a direct and proximate result of the Private Information stolen during the Data Breach;

c.     Damages arising from the inability to use accounts that may have been compromised during the Data Breach;

d.     Costs associated with time spent to address and mitigate the actual and future consequences of the Data Breach, such as finding fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, placing freezes and alerts on their credit reports, contacting their financial institutions to notify them that their personal information was exposed and to dispute fraudulent charges, imposition of withdrawal and purchase limits on compromised accounts,25nsuccess25g but not limited to lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience, nuisance, and annoyance of dealing with all issues resulting from the Data Breach, if they were fortunate enough to learn of the Data Breach despite Defendant's delay in disseminating notice in accordance with state law;

e.     The imminent and impending injury resulting from potential fraud and identity theft posed because their Private Information is exposed for theft and sale on the dark web; and

f.     The loss of Plaintiffs' and Class Members' privacy.

97.     Plaintiffs and Class Members have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their Private Information being accessed by cybercriminals, risks that will not abate within the limited time of credit monitoring offered by Defendant.

98.     As a direct and proximate result of Defendant's acts and omissions in failing to protect and secure Private Information, Plaintiffs and Class Members have been placed at a

substantial risk of harm in the form of identity theft, and they have incurred and will incur actual damages in an attempt to prevent identity theft.

99.     Plaintiffs retain an interest in ensuring there are no future breaches, in addition to seeking a remedy for the harms suffered as a result of the Data Breach on behalf of both themselves and similarly situated individuals whose Private Information was accessed in the Data Breach.

## G.     EXPERIENCES SPECIFIC TO PLAINTIFFS

### *Plaintiff Elizabeth Parchinskya*

100.     Plaintiff Parchinskya received Defendant's data breach notice dated January 31, 2024. The notice informed her that her Private Information was improperly accessed and obtained by third parties.

101.     As a result of the Data Breach, Plaintiff Parchinskya has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Parchinskya has also spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including, but not limited to, work and recreation.

102.     As a result of the Data Breach, Plaintiff Parchinskya has suffered anxiety due to the public dissemination of her personal information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using his Private Information for purposes of identity theft and fraud. Plaintiff Parchinskya is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

103.     Plaintiff Parchinskya suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and

diminution in the value of her Private Information, a form of property that Defendant obtained from her; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

104.    As a result of the Data Breach, Plaintiff Parchinskya anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach, he is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

**Plaintiff Grace Viviano**

105.    Plaintiff Grace Viviano was a student at Emmanuel College from 2018 to 2022 and an employee of Emmanuel from 2018 to 2021.

106.    Plaintiff Viviano received Defendant's data breach notice dated January 31, 2024. The notice informed her that her Private Information was improperly accessed and obtained by third parties.

107.    As a result of the Data Breach, Plaintiff Viviano has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Viviano has also spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including, but not limited to, work and recreation.

108.    As a result of the Data Breach, Plaintiff Viviano has suffered anxiety due to the public dissemination of her personal information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using his Private Information for purposes of identity theft and fraud. Plaintiff Viviano is

concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

109.    Plaintiff Viviano suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from her; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

110.    As a result of the Data Breach, Plaintiff Viviano anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach, he is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### *Plaintiff Brian Hamdan*

111.    Plaintiff Brian Hamdan is a current student at Emmanuel College.

112.    Plaintiff Hamdan received Defendant's data breach notice dated January 31, 2024. The notice informed him that his Private Information was improperly accessed and obtained by third parties.

113.    After the Data Breach, Plaintiff Hamdan noticed a dramatic increase in the number of spam emails and calls received.

114.    As a result of the Data Breach, Plaintiff Hamdan has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Hamdan has also spent several hours dealing with the

Data Breach, valuable time he otherwise would have spent on other activities, including, but not limited to, work and recreation.

115.    As a result of the Data Breach, Plaintiff Hamdan has suffered anxiety due to the public dissemination of his personal information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using his Private Information for purposes of identity theft and fraud. Plaintiff Hamdan is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

116.    Plaintiff Hamdan suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his Private Information, a form of property that Defendant obtained from him; (b) violation of his privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

117.    As a result of the Data Breach, Plaintiff Hamdan anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach, he is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

**Plaintiff Sopiya Shrestha**

118.    Plaintiff Sopiya Shrestha received Defendant's data breach notice dated January 31, 2024. The notice informed her that her Private Information was improperly accessed and obtained by third parties.

119.    Since the Data Breach, Plaintiff Shrestha has experienced an uptake in spam calls concerning fraudulent applications/solicitations for insurance, fraudulent communications about

her FICO score or FHA loans, fraudulent communications from her "bank," and at least one instance in which an unauthorized charge of $750 appeared on her bank account statement.

120.    As a result of the Data Breach, Plaintiff Shrestha has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Shrestha has also spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including, but not limited to, work and recreation.

121.    As a result of the Data Breach and suspicious activity, Plaintiff Shrestha has suffered anxiety due to the public dissemination of her personal information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using his Private Information for purposes of identity theft and fraud. Plaintiff Shrestha is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

122.    Plaintiff Shrestha suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from her; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

123.    As a result of the Data Breach, Plaintiff Shrestha anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach, he is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### *Plaintiff Casey Whalen*

124.    Plaintiff Casey Whalen applied to Emmanuel College in 2015 but elected not to attend Emmanuel.

125.    Plaintiff Whalen received Defendant's data breach notice dated January 31, 2024. The notice informed him that his Private Information was improperly accessed and obtained by third parties.

126.    Plaintiff Whalen can see no legitimate business reason for Defendant to store and maintain his Private Information for so many years since he submitted his application.

127.    Since the time of the Data Breach, some individual or individuals have repeatedly, and for dozens of times, attempted to log in to Plaintiff's PayPal account.  These efforts are only unsuccessful because he has enabled two-factor authentication. Nonetheless, these constant intrusions have taken time and effort to address on Plaintiff's part. On information and belief, these attempted intrusions have been possible due in part to the types of information stolen from Defendant's systems.

128.    As a result of the Data Breach, Plaintiff Whalen has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Whalen has also spent several hours dealing with the Data Breach, valuable time he otherwise would have spent on other activities, including, but not limited to, work and recreation.

129.    As a result of the Data Breach, Plaintiff Whalen has suffered anxiety due to the public dissemination of his personal information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling,

and using his Private Information for purposes of identity theft and fraud. Plaintiff Whalen is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

130.    Plaintiff Whalen suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his Private Information, a form of property that Defendant obtained from him; (b) violation of his privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

131.    As a result of the Data Breach, Plaintiff Whalen anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach, he is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### *Plaintiff Luke Millspaugh*

132.    Plaintiff Casey Millspaugh applied to Emmanuel College in 2016 but elected not to attend Emmanuel.

133.    Plaintiff Millspaugh received Defendant's data breach notice dated January 31, 2024. The notice informed him that his Private Information was improperly accessed and obtained by third parties.

134.    Plaintiff Millspaugh can see no legitimate business reason for Defendant to store and maintain his Private Information for so many years since he submitted his application.

135.    Since the time of the Data Breach, some individual or individuals have repeatedly, and for dozens of times, attempted to log in to Plaintiff's Venmo account.  These efforts are only unsuccessful because he has enabled two-factor authentication. Nonetheless, these constant

intrusions have taken time and effort to address on Plaintiff's part. On information and belief, these attempted intrusions have been possible due in part to the types of information stolen from Defendant's systems.

136.    As a result of the Data Breach, Plaintiff Millspaugh has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Millspaugh has also spent several hours dealing with the Data Breach, valuable time he otherwise would have spent on other activities, including, but not limited to, work and recreation.

137.    As a result of the Data Breach, Plaintiff Millspaugh has suffered anxiety due to the public dissemination of his personal information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using his Private Information for purposes of identity theft and fraud. Plaintiff Millspaugh is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

138.    Plaintiff Millspaugh suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his Private Information, a form of property that Defendant obtained from him; (b) violation of his privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

139.    As a result of the Data Breach, Plaintiff Millspaugh anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by

the Data Breach. And, as a result of the Data Breach, he is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V.   CLASS REPRESENTATION ALLEGATIONS

140.   Plaintiffs bring this action on behalf of themselves and, pursuant to Fed. R. Civ. P. 23(a) and 23(b), a Class of:

> All persons in the United States whose Private Information was accessed in the Data Breach (the "Class").

Excluded from the Class are Defendant, its executives and officers, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change or expand the Class definition after conducting discovery.

141.   Plaintiff Whalen also brings this action, pursuant to Fed. R. Civ. P. 23(a) and 23(b), on behalf of a Subclass of residents of New Hampshire, defined as:

> All persons who are residents of New Hampshire whose Private Information as accessed in the Data Breach (the "New Hampshire Subclass").

Excluded from the New Hampshire Subclass are Defendant, its executives and officers, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change or expand the New Hampshire Subclass definition after conducting discovery.

142.   <u>Numerosity</u>: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. The exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiffs only through the discovery process. On information and belief, the number of affected individuals estimated to be 89,064 individuals. The members of the Class will be identifiable through information and records in Defendant's possession, custody, and control.

143.   <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over

the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

a.   When Defendant learned of the Data Breach;

b.   Whether hackers obtained Class Members' Private Information via the Data Breach;

c.   Whether Defendant's response to the Data Breach was adequate;

d.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

e.   Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

f.   Whether Defendant owed a duty to safeguard their Private Information;

g.   Whether Defendant breached its duty to safeguard Private Information;

h.   Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

i.   Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

j.   Whether Defendant's conduct violated the FTCA, HIPAA, and/or the Consumer Protection Act invoked herein;

k.   Whether Defendant's conduct was negligent;

l.   Whether Defendant's conduct was *per se* negligent;

m.   Whether Defendant was unjustly enriched;

n.   What damages Plaintiffs and Class Members suffered as a result of Defendant's misconduct;

o.   Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages; and

p.   Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief.

144.    <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class as Plaintiffs and all members of the Class had their Private Information compromised in the Data Breach. Plaintiffs' claims and damages are also typical of the Class because they resulted from Defendant's uniform wrongful conduct. Likewise, the relief to which Plaintiffs are entitled to is typical of the Class because Defendant has acted, and refused to act, on grounds generally applicable to the Class.

145.    <u>Adequacy</u>: Plaintiffs are adequate class representatives because their interests do not materially or irreconcilably conflict with the interests of the Class Plaintiffs seek to represent, Plaintiffs have retained counsel competent and highly experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs and counsel will fairly and adequately protect the interests of the Class. Neither Plaintiffs nor their counsel have any interests that are antagonistic to the interests of other members of the Class.

146.    <u>Superiority</u>: Compared to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class, a class action is superior. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, Defendant's records and databases.

## VI.   CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (By Plaintiffs on behalf of the Class)

147.   Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

148.   Defendant owes a duty of care to protect the Private Information belonging to Plaintiffs and Class Members. Defendant also owes several specific duties including, but not limited to, the duty:

      a.     to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

      b.     to protect current, former, and prospective students' and employees members' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

      c.     to have procedures in place to detect the loss or unauthorized dissemination of Private Information in its possession;

      d.     to employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to the FTCA;

      e.     to implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

      f.     to promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

149.   Defendant owes this duty because it had a special relationship with Plaintiffs and Class Members. Plaintiffs and Class Members entrusted their Private Information to Defendant on the understanding that adequate security precautions would be taken to protect this information. Furthermore, only Defendant had the ability to protect its systems and the Private Information stored on them from attack.

150.   Defendant also owes this duty because industry standards mandate that Defendant protect Plaintiffs' and Class Members' confidential Private Information.

151.    Defendant also owes a duty to timely disclose any unauthorized access and/or theft of the Private Information belonging to Plaintiffs and Class Members. This duty exists to provide Plaintiffs and Class Members with the opportunity to undertake appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Private Information.

152.    Defendant breached its duties owed to Plaintiffs and Class Members by failing to take reasonable appropriate measures to secure, protect, and/or otherwise safeguard their Private Information.

153.    Defendant also breached the duties it owed to Plaintiffs and Class Members by failing to timely and accurately disclose to them that their Private Information had been improperly acquired and/or accessed.

154.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members were damaged. These damages include, and are not limited to:

- Lost or diminished value of their Private Information;

- Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information;

- Lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges; and

- Permanent increased risk of identity theft.

155.    Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant and the damages they suffered were the foreseeable result of the aforementioned inadequate security practices.

156.    In failing to provide prompt and adequate individual notice of the Data Breach, Defendant also acted with reckless disregard for the rights of Plaintiffs and Class Members.

157.    Plaintiffs and the Class are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

### COUNT II
### NEGLIGENCE *PER SE*
**(By Plaintiffs on behalf of the Class)**

158.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

159.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, imposes a duty on Defendant to provide fair and adequate data security to secure, protect, and/or otherwise safeguard the Private Information of Plaintiffs and Class Members.

160.    HIPAA imposes a duty on Defendant to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information. 42 U.S.C. § 1302(d), *et seq*.

161.    HIPAA also requires Defendant to render unusable, unreadable, or indecipherable all Private Information it collected. Defendant was required to do so through "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

162.    Defendant violated the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to secure, protect, and/or otherwise safeguard Plaintiffs' and Class Members' Private Information.

163.    Defendant violated HIPAA by failing to properly encrypt the Private Information it collected.

164.    Defendant's failure to comply with HIPAA and the FTCA constitutes negligence *per se*.

165.    Plaintiffs and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect.

166.    It was reasonably foreseeable that the failure to protect and secure Plaintiffs' and Class Members' Private Information in compliance with applicable laws and industry standards would result in that Information being accessed and stolen by unauthorized actors.

167.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class Members have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to theft of their personal information, damages from the lost time and effort to mitigate the impact of the Data Breach, and permanently increased risk of identity theft.

168.    Plaintiffs and Class Members are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

## COUNT III
## BREACH OF IMPLIED CONTRACT
### (By Plaintiffs on behalf of the Class)

169.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

170.    Plaintiffs and Class Members provided Defendant with their Private Information.

171.    By providing their Private Information, and upon Defendant's acceptance of this information, Plaintiffs and the Class, on one hand, and Defendant, on the other hand, entered into implied-in-fact contracts for the provision of data security, separate and apart from any express contract entered into between the parties.

172.    The implied contracts between Defendant and Plaintiffs and Class Members obligated Defendant to take reasonable steps to secure, protect, safeguard, and keep confidential Plaintiffs' and Class Members' Private Information. The terms of these implied contracts are described in federal laws, state laws, and industry standards, as alleged above.

173.    The implied contracts for data security also obligated Defendant to provide Plaintiffs and Class Members with prompt, timely, and sufficient notice of any and all unauthorized access or theft of their Private Information.

174.    Defendant breached these implied contracts by failing to take, develop and implement adequate policies and procedures to safeguard, protect, and secure the Private Information belonging to Plaintiffs and Class Members; allowing unauthorized persons to access Plaintiffs' and Class Members' Private Information; and failing to provide prompt, timely, and sufficient notice of the Data Breach to Plaintiffs and Class Members, as alleged above.

175.    As a direct and proximate result of Defendant's breaches of the implied contracts, Plaintiffs and Class Members have been damaged as described herein, will continue to suffer injuries as detailed above due to the continued risk of exposure of Private Information, and are entitled to damages in an amount to be proven at trial.

**COUNT IV**
**UNJUST ENRICHMENT**
**(By Plaintiffs on behalf of the Class)**

176.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

177.    This count is brought in the alternative to Count III.

178.    Plaintiffs and the Class have a legal and equitable interest in their Private Information that was collected and maintained by Defendant.

179.    Defendant was benefitted by the conferral of Plaintiffs' and Class Members' Private Information and by its ability to retain and use that information. Defendant understood that it was in fact so benefitted.

180.    Defendant also understood and appreciated that Plaintiffs' and Class Members' Private Information was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

181.    But for Defendant's willingness and commitment to maintain its privacy and confidentiality, Plaintiffs and Class Members would not have provided or authorized their Private Information to be provided to Defendant, and Defendant would have been deprived of the competitive and economic advantages it enjoyed by falsely claiming that its data-security safeguards met reasonable standards. These competitive and economic advantages include, without limitation, wrongfully gaining students and employees, gaining the reputational advantages conferred upon it by Plaintiffs and Class Members, collecting excessive advertising and sales revenues as described herein, monetary savings resulting from failure to reasonably upgrade and maintain data technology infrastructures, staffing, and expertise raising investment capital as described herein, and realizing excessive profits.

182.    As a result of Defendant's wrongful conduct as alleged herein (including, among other things, its deception of Plaintiffs, the Class, and the public relating to the nature and scope of the data breach; its failure to employ adequate data security measures; its continued maintenance and use of the Private Information belonging to Plaintiffs and Class Members without having

adequate data security measures; and its other conduct facilitating the theft of that Private Information), Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and the Class.

183.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiffs' and Class Members' sensitive Private Information, while at the same time failing to maintain that information secure from intrusion.

184.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiffs and Class Members in an unfair and unconscionable manner.

185.    The benefit conferred upon, received, and enjoyed by Defendant was not conferred officiously or gratuitously, and it would be inequitable and unjust for Defendant to retain the benefit.

186.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

187.    Defendant is therefore liable to Plaintiffs and the Class for restitution in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically

the value to Defendant of the PII and medical information that was accessed and exfiltrated in the Data Breach and the profits Defendant receives from the use and sale of that information.

188.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

189.    Plaintiffs and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT V
## INVASION OF PRIVACY
### (By Plaintiffs on behalf of the Class)

190.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

191.    Plaintiffs and Class Members had a reasonable expectation of privacy in the Private Information that Defendant possessed and/or continues to possess.

192.    By failing to keep Plaintiffs' and Class Members' Private Information safe, and by misusing and/or disclosing their Private Information to unauthorized parties for unauthorized use, Defendant invaded Plaintiffs' and Class Members' privacy by:

      a.    Intruding into their private affairs in a manner that would be highly offensive to a reasonable person; and

      b.    Publicizing private facts about Plaintiffs and Class Members, which is highly offensive to a reasonable person.

193.    Defendant knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiffs' position would consider Defendant's actions highly offensive.

194.    Defendant invaded Plaintiffs' and Class Members' right to privacy and intruded into Plaintiffs' and Class Members' private affairs by misusing and/or disclosing their private information without their informed, voluntary, affirmative, and clear consent.

195.    As a proximate result of such misuse and disclosures, Plaintiffs' and Class Members' reasonable expectation of privacy in their Private Information was unduly frustrated and thwarted. Defendant's conduct amounted to a serious invasion of Plaintiffs' and Class Members' protected privacy interests.

196.    In failing to protect Plaintiffs' and Class Members' Private Information, and in misusing and/or disclosing their Private Information, Defendant has acted with malice and oppression and in conscious disregard of Plaintiffs' and Class Members' rights to have such information kept confidential and private, in failing to provide adequate notice, and in placing its own economic, corporate, and legal interests above the privacy interests of its thousands of students and employees. Plaintiffs, therefore, seek an award of damages, including punitive damages, individually and on behalf of the Class.

## COUNT VI
## BREACH OF IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING
**(By Plaintiffs on behalf of the Class)**

197.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

198.    Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

199.    Plaintiffs and Class Members have complied with and performed all conditions of their contracts with Defendant.

200.    Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard Private Information and financial information, failing to timely and accurately disclose the Data Breach to Plaintiffs and Class Members and continued acceptance of Private Information and financial

information and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

201.    Defendant acted in bad faith and/or with malicious motive in denying Plaintiffs and Class Members the full benefit of their bargains as originally intended by the parties, thereby causing them injury in an amount to be determined at trial.

**COUNT VII**
**BREACH OF CONFIDENCE**
**(By Plaintiffs on behalf of the Class)**

202.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

203.    During Plaintiffs' and Class Members' interactions with Defendant, Defendant was fully aware of the confidential nature of the Private Information that Plaintiffs and Class Members provided to it.

204.    As alleged herein and above, Defendant's relationship with Plaintiffs and Class Members was governed by promises and expectations that Plaintiffs and Class Members' Private Information would be collected, stored, and protected in confidence, and would not be accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by unauthorized third parties

205.    Plaintiffs and Class Members provided their respective Private Information to Defendant with the explicit and implicit understandings that Defendant would protect and not permit the Private Information to be accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by unauthorized third parties.

206.    Plaintiffs and Class Members also provided their Private Information to Defendant with the explicit and implicit understanding that Defendant would take precautions to protect their

Private Information from unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing, such as following basic principles of protecting its networks and data systems.

207.   Defendant voluntarily received, in confidence, Plaintiffs' and Class Members' Private Information with the understanding that the Private Information would not be accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by the public or any unauthorized third parties.

208.   Due to Defendant's failure to prevent, detect and avoid the Data Breach from occurring by, inter alia, not following best information security practices to secure Plaintiffs' and Class Members' Private Information, Plaintiffs' and Class Members' Private Information was accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by unauthorized third parties beyond Plaintiffs' and Class Members' confidence and without their express permission.

209.   As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiffs and Class Members have suffered damages, as alleged herein.

210.   But for Defendant's failure to maintain and protect Plaintiffs' and Class Members' Private Information in violation of the parties' understanding of confidence, their Private Information would not have been accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by unauthorized third parties. The Data Breach was the direct and legal cause of the misuse of Plaintiffs' and Class Members' Private Information and the resulting damages.

211.   The injury and harm Plaintiffs and Class Members suffered and will continue to suffer was the reasonably foreseeable result of Defendant's unauthorized misuse of Plaintiffs' and

Class Members' Private Information. Defendant knew its data systems and protocols for accepting and securing Plaintiffs' and Class Members' Private Information had security and other vulnerabilities that placed Plaintiffs' and Class Members' Private Information in jeopardy.

212.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and Class Members have suffered and will continue to suffer injury, as alleged herein, including but not limited to: (i) actual identity theft, (ii) the compromise, publication, and/or theft of their Private Information, (iii) out-of-pocket expenses associated with the prevention, detection and recovery from identity theft and/or unauthorized use of their Private Information, (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft, (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Class Members' Private Information in its continued possession, (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members, (vii) the diminished value of Plaintiffs' and Class Members' Private Information, and (viii) the diminished value of Defendant's services for which Plaintiffs and Class Members paid and received.

### COUNT VIII
### VIOLATION OF NEW HAMPSHIRE
### CONSUMER PROTECTION ACT, RSA § 358-A, *et seq.*
### (By Plaintiff Casey Whalen on Behalf of the New Hampshire Subclass)

213.    Plaintiff Casey Whalen incorporates and realleges all allegations above as if fully set forth herein.

214. Plaintiff Casey Whalen and the New Hampshire Subclass are residents of New Hampshire.

215. Defendant conduct business in New Hampshire by soliciting applications for acceptance within the State of New Hampshire and maintain computerized data that contain the personal identifying information of New Hampshirites.

216. The NHCPA prohibits a person or entity from using "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. Rev. Stat. Ann. § 358-A:2.

217. The New Hampshire statutory scheme provides a non-exhaustive list of acts that constitute violations of the statute, which includes but is not limited to the following:

    a. "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that such person does not have[.]" N.H. Rev. Stat. Ann. § 358-A:2(V).

    b. "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another[.]" N.H. Rev. Stat. Ann. § 358-A:2(VII).

    c. "Advertising goods or services with intent not to sell them as advertised[.]" N.H. Rev. Stat. Ann. § 358-A:2(IX).

218. Defendant engaged in the conduct alleged in this complaint through transactions in and involving trade and commerce within the State of New Hampshire. N.H. Rev. Stat. Ann. § 358-A:2.

219. While involved in trade or commerce, Defendant violated the NHCPA by engaging in unfair, deceptive, and unconscionable business practices including, among other things, by:

    a) Failing to implement and maintain appropriate and reasonable security procedures and practices to safeguard and protect the Private Information of Defendant's patients from unauthorized access and disclosure; and

b)   Failing to disclose the material fact that its computer systems and data security practices were inadequate to safeguard and protect the Private Information of Plaintiffs and the New Hampshire Subclass from being compromised, stolen, lost, or misused.

220.   Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard Plaintiffs and the New Hampshire Subclass' Private Information entrusted to it, and that risk of a data breach or theft was highly likely.

221.   Defendant should have disclosed this information because Defendant was in a superior position to know the true facts related to the defective data security.

222.   Defendant's failures constitute an unfair practice and false, deceptive, and misleading representations regarding the security of Defendant's network and aggregation of Private Information.

223.   These unfair practices and misleading representations upon which Plaintiff and the New Hampshire Subclass relied were material facts (e.g., as to Defendant's adequate protection of Private Information), and applicants and students relied on those representations to their detriment.

224.   In committing the acts alleged herein, Defendant engaged in fraudulent, deceptive, and unfair practices by omitting, failing to disclose, or inadequately disclosing to Plaintiff and the New Hampshire Subclass Defendant did not follow industry best practices for the collection, use, and storage of Private Information.

225.   Defendant's conduct, as described herein, constitutes willful and/or knowing violations of the NHCPA.

226.   As a direct and proximate result of Defendant's conduct, Plaintiff and the New Hampshire Subclass have been harmed and have suffered damages including, but not limited to: damages arising from attempted identity theft and fraud; out-of-pocket expenses associated with procuring identity protection and restoration services; increased risk of future identity theft and

fraud, and the costs associated therewith; and time spent monitoring, addressing and correcting the current and future consequences of the Data Breach.

227.    As a direct and proximate result of Defendant's fraudulent, deceptive, and unfair practices and omissions, Plaintiff and the New Hampshire Subclass' Private Information was disclosed to third parties without authorization, causing and will continue to cause Plaintiffs and the New Hampshire Subclass damages. Accordingly, Plaintiffs and the New Hampshire Subclass are entitled to recover damages in accordance with the NHCPA, an order providing declaratory and injunctive relief, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all members of the Class and Subclass, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A.    That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' Counsel as Class Counsel;

B.    That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.    That the Court award Plaintiffs and Class Members compensatory, consequential, and general damages in an amount to be determined at trial;

D.    That the Court award Plaintiffs and Class Members statutory damages, and punitive or exemplary damages, to the extent permitted by law;

E.    That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

F.    That the Court award pre- and post-judgment interest at the maximum legal rate;

G.    That the Court award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

H.    That the Court grant all other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the putative Class, demand a trial by jury on all

issues so triable.


Date: May 13, 2024                                  Respectfully Submitted,

                                                    /s/ Kevin Laukaitis
                                                    Kevin Laukaitis*
                                                    **LAUKAITIS LAW LLC**
                                                    954 Avenida Ponce De Leon
                                                    Suite 205, #10518
                                                    San Juan, PR 00907
                                                    T: (215) 789-4462
                                                    klaukaitis@laukaitislaw.com

                                                    /s/ James J. Reardon
                                                    James J. Reardon (BBO# 566161)
                                                    **REARDON SCANLON LLP**
                                                    45 South Main Street, 3rd Floor
                                                    West Hartford, CT 06107
                                                    T: (860) 944-9455
                                                    james.reardon@reardonscanlon.com

                                                    Randi Kassan
                                                    **MILBERG COLEMAN BRYSON
                                                    PHILLIPS GROSSMAN, PLLC**
                                                    100 Garden City Plaza, Suite 500
                                                    Garden City, NY 11530
                                                    Telephone: (212) 594-5300
                                                    rkassan@milberg.com

                                                    David K. Lietz*
                                                    **MILBERG COLEMAN BRYSON
                                                    PHILLIPS GROSSMAN, PLLC**
                                                    5335 Wisconsin Avenue NW, Suite 440
                                                    Washington, D.C. 20015-2052
                                                    Telephone: (866) 252-0878
                                                    Facsimile: (202) 686-2877
                                                    dlietz@milberg.com

                                                    Patrick J. Sheehan (BBO # 639320)
                                                    **WHATLEY KALLAS, LLP**

101 Federal Street, 19th Floor
Boston, MA 02110
Telephone: (617) 203-8459
Facsimile: (800) 922-4851
psheehan@whatleykallas.com

Daniel O. Herrera*
Nickolas J. Hagman*
Alex Lee*
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
dherrera@caffertyclobes.com
nhagman@caffertyclobes.com
alee@caffertyclobes.com

Daniel Srourian, Esq.*
**SROURIAN LAW FIRM, P.C.**
3435 Wilshire Blvd. Suite 1710
Los Angeles, California 90010
Telephone: (213) 474-3800
Facsimile: (213) 471-4160
Email: daniel@slfla.com

Robert J. Maselek, Jr.
**MCDONOUGH COHEN & MASELEK,
LLP**
53 State Street, Suite 500
Boston, MA 02109
Direct: 617.742.6520 (Ext. 246)
Fax: 617.742.1393
rmaselek@mcmlawfirm.com

Carl V. Malmstrom*
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, Illinois 60604
Tel: (312) 984-0000
Fax: (212) 686-0114
malmstrom@whafh.com

*Attorneys for Plaintiffs and the Proposed Class*

*Admitted Pro Hac Vice or Application Forthcoming*